MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, Plaintiff,

v.

Cornelius E. CALLAHAN and John M. Polanshek, Jr. Defendants.

No. 2:03–CV–129.

United States District Court, D. Vermont.

May 7, 2003.

Stephen G. Norten, Paul, Frank & Collins, P.C., Burlington, Timothy S. Cole, Rubin & Associates, P.C., Paoli, PA, for Plaintiff.

Gregory Scott Mertz, Mertz, Talbott & Simonds, PLC, Burlington, David L. Ward, Murphy & Michaels, L.L.P., Boston, MA, for Defendant.

## MEMORANDUM AND ORDER

SESSIONS, Chief Judge.

This case arises out of the defendants' resignation from the Burlington office of Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") where they were employed as financial analysts. Merrill Lynch alleges that after resigning the defendants retained a list of client names and information and used that list to solicit their former clients in violation of certain contracts between the parties and the Vermont Uniform Trade Secrets Act, Vt. Stat. Ann. tit. 9, §§ 4601–09.[1] On April 29, 2003, Merrill Lynch moved for a temporary restraining order and preliminary injunctive relief prohibiting the defendants from soliciting their former clients or using or disclosing the list of client names and information. The Court held an evidentiary hearing on the motion on May 2, 2003. For the reasons described below, Merrill Lynch's motion is **DENIED** (Doc. 4).

### I. Background

Merrill Lynch is a financial services company and a Delaware corporation maintaining its principal place of business in New Jersey. Defendants Cornelius Callahan and John Polanshek are residents of Vermont and worked as financial analysts with Merrill Lynch in Burlington for 15 and 18 years, respectively. Merrill Lynch provided both significant training as financial analysts. As a condition of their employment with Merrill Lynch, Callahan and Polanshek executed Account Executive Trainee Agreements. Under the provisions of these agreements, each promised that in the event of termination of his employment he would not solicit, for one year, any clients he served while at Merrill Lynch or any clients whose names became

---

1. Merrill Lynch's complaint also includes counts of breach of fiduciary duty and unfair competition; however these counts were not the focus of their motion for preliminary relief.

known to him during that time.[2] Each also agreed that the names and addresses of Merrill Lynch's clients would remain the property of Merrill Lynch, and would be treated by him as confidential information of Merrill Lynch at all times during his employment and after his termination. In addition, Callahan and Polanshek agreed in writing, on an annual basis, to abide by Merrill Lynch's privacy policy regarding confidentiality of client information which prohibited the sale or rent of clients' personal information and the release of such information without client authorization.[3]

On Friday April 25, 2003, Callahan, Polanshek, and a client associate[4] who worked with them resigned, without notice. On the same day they joined Wachovia Securities, Inc. ("Wachovia"), a competing firm located nearby. At the time of their resignation, Callahan and Polanshek had access to accounts representing more than $79 million in assets and generating over $801,000 in commission revenues for Merrill Lynch in the preceding 12 months. As a condition of their transfer, Callahan and Polanshek received substantial upfront financial benefits from Wachovia.

While at Merrill Lynch, Callahan and Polanshek maintained a list of the names, addresses, and phone numbers of 429 clients whose accounts they handled. This list was developed by them over their years at Merrill Lynch using existing lists provided to them by Merrill Lynch and through their own contacts and research, using Merrill Lynch's resources. On the

afternoon they resigned, they took a hard copy of this list with them and used it to contact many of these clients by phone. Callahan also has an electronic version of the list.

Within a few days of their resignation Callahan, Polanshek, and the client associate sent mailings to virtually all the clients on the list. Each mailing included a letter explaining that after careful consideration they had decided to leave Merrill Lynch and join Wachovia. Each mailing also included blank account transfer forms for clients who decided to transfer their accounts from Merrill Lynch to Wachovia. The letter offered to help clients complete the forms if needed. As of the hearing, two clients had transferred their accounts to Wachovia.

Callahan, Polanshek, and the client associate sent a second mailing to their former clients on the day of the hearing. The mailing included a letter stating that the three were "settled in" at Wachovia and asking the clients to call if they had questions about the account transfer forms.

Callahan and Polanshek allege that Merrill Lynch maintains a policy of encouraging the recruitment of experienced financial analysts from other firms and requiring the recruited financial analysts to provide their client statements and other client information to Merrill Lynch before and after leaving their old firms. They submitted affidavits stating that Merrill Lynch has recently recruited such financial analysts and has made use of the client records from those analysts' former

2. Polanshek's Account Executive Trainee Agreement and his Account Executive Agreement limited the solicitation prohibition to clients who reside within one hundred miles of the Merrill Lynch office in which he was employed.

3. Callahan also agreed to abide by Merrill Lynch's Conflict of Interest Agreement, which

prohibited him from disclosing confidential information or business secrets relating to Merrill Lynch, and its business conduct guidelines, which provided that employees may not use client lists or other Merrill Lynch information for personal benefit.

4. The client associate is not named in this lawsuit.

firms. Neither maintains that they were recruited to Merrill Lynch in this manner. Waltien admits that Merrill Lynch has a policy of hiring experienced financial analysts from other firms. However, he testified, based on his 11 years with the firm, that Merrill Lynch does not ask for client names or lists before doing so. Instead, after such a financial analyst is hired, Merrill Lynch expects that the analyst will solicit former clients, but only to the extent the he or she recalls the names from memory. Waltien testified that this kind of solicitation of former clients from memory is a standard industry practice.

Waltien also testified, based on his 32 years of experience in the financial services industry, that clients value greatly the confidentiality of their personal and financial information. Merrill Lynch has taken numerous steps to protect this confidentiality through the agreements that Callahan and Polanshek signed and through other company policies. He also testified that future revenues from an account are difficult to predict because they are affected by a variety of factors including the stock market and changes in the life of the account-holder. According to Waltien, referrals from current clients are the "lifeblood" of Merrill Lynch's business and it is difficult to predict the revenue the firm will earn in referrals from any one account. Finally he stated that Callahan and Polanshek's departure with the client list had hurt office morale, had caused employees to be worried that the office might close, and could encourage other employees to take similar offers with competing firms.

## II. Discussion

■ To obtain preliminary injunctive relief,[5] Merrill Lynch must show: (a) that it will suffer irreparable harm in the absence of an injunction and (b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor. *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,* 60 F.3d 27, 33 (2d Cir.1995). In this case, Merrill Lynch has failed to demonstrate that Callahan and Polanshek's continued use of the client list and solicitation of their former clients will cause it irreparable harm. In addition, given Merrill Lynch's policy of encouraging newly hired financial analysts to solicit their former clients, denial of the motion is appropriate under the doctrine of unclean hands.

Merrill Lynch focuses on two potential sources of irreparable harm: the loss of clients on the list due to solicitation by Callahan and Polanshek and the loss of the trust and confidence of clients whose financial and other information it has pledged to keep confidential.[6] Merrill Lynch has not met its burden of demonstrating, however, that it will suffer future irreparable harm on these bases.

■ First, it is undisputed that Callahan and Polanshek have already taken the client list and contacted virtually all of their 429 clients twice. In essence, the damage is already done. Second, the Court is not convinced that the financial losses resulting from any client account

---

5. Merrill Lynch also sought a temporary restraining order. Because both sides have had the opportunity to present evidence and argument, the Court will address the request for a preliminary injunction only.

6. Merrill Lynch also argues that Callahan and Polanshek's successful departure with the client list will irreparably damage the stability of the Burlington office. Merrill Lynch has provided very limited evidence of such a possibility, thus this claim is too speculative to support a finding of irreparable harm.

transfers to Wachovia will be immeasurable. Although Waltien points out that many factors affect the future revenue from a client account, a reasonable estimate of the damages can be made based on Merrill Lynch's records of the assets and commissions related to these accounts, similar records created by Wachovia for any accounts that are transferred, and expert testimony. *See Morgan Stanley DW, Inc. v. Frisby*, 163 F.Supp.2d 1371, 1376 (N.D.Ga.2001) (given electronic monitoring of individual transactions and records of past revenues, losses caused by transfer of client accounts compensable via monetary damages); *Merrill Lynch, Pierce, Fenner & Smith v. Bennert*, 980 F.Supp. 73, 75 (D.Me.1997) (same); *Merrill Lynch, Pierce, Fenner & Smith v. Bishop*, 839 F.Supp. 68, 73–75 (same). *But see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1054 (4th Cir.1985) (finding economic losses associated with client transfers to be irreparable). Where an injury is compensable through money damages, there is no irreparable harm. *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974); *Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1185–86 (2d Cir.1995); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam).

■ The same argument applies to clients who might depart Merrill Lynch based on their loss of trust and confidence related to the disclosure of their names, addresses, and telephone numbers to Wachovia. Merrill Lynch has not demonstrated that the economic loss caused by any such departures is immeasurable, just as it has failed to do so regarding client departures caused by solicitation. To the extent that Merrill Lynch argues more broadly that it faces irreparable damage to its reputation and good will due to lost customer trust, it has also provided little support for this claim. *See Sampson*, 415 U.S. at 96, 94 S.Ct. 937 (even if supported, claim of reputation damage does not necessarily equate with irreparable harm). *But see Bishop*, 839 F.Supp. at 71–72 (holding loss of client confidentiality irreparable in similar context); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Kramer*, 816 F.Supp. 1242, 1247 (N.D.Ohio 1992) (same). It is notable that Callahan and Polanshek have taken only the names, addresses, and phone numbers of their former clients, and not their confidential financial documents, which would be more likely to lead to client distrust. Moreover, as discussed below, Merrill Lynch's concern about client confidentiality related to client names and contact information is belied by its own practice of expecting recruited financial advisors to contact their former clients.

■ Even if Merrill Lynch had demonstrated irreparable harm, the Court would deny its demand for preliminary injunctive relief under the doctrine of unclean hands. According to Waltien, solicitation of former clients from memory is standard practice both at Merrill Lynch and throughout the financial services industry. By seeking to halt such solicitation, Merrill Lynch seeks to enjoin the same behavior in which it engages as a matter of company policy. Under the doctrine of unclean hands, " 'he who comes into equity must come with clean hands.' " *Starr Farm Beach Campowners Ass'n v. Boylan*, —— Vt. ——, 811 A.2d 155, 160 (2002) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945)). Where the plaintiff bringing a claim has committed a willful act concerning that cause of action which "trangress[es] equitable standards of conduct," the plaintiff can be prohibited from maintaining that action. *Id.* Merrill Lynch con-

tends that this doctrine is inapplicable because its practice regarding solicitation is not directly related to its specific claim against Callahan and Polanshek. *See Langdon v. Templeton*, 66 Vt. 173, 28 A. 866, 869 (1894) (the doctrine is limited to misconduct connected to the matter in litigation and that has affected the equitable relations of the parties and the equitable rights asserted by the plaintiff); *see also Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245, 54 S.Ct. 146, 78 L.Ed. 293 (1933) (courts require clean hands "only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation"). The Court, however, has broad discretion in refusing to aid the unclean litigant. *Langdon*, 28 A. at 869; *see also Keystone*, 290 U.S. at 245–46, 54 S.Ct. 146. Given that Merrill Lynch has admitted to engaging regularly in the same kind of behavior it seeks to enjoin, the Court will not use its equitable powers to enjoin such behavior. *See Frisby*, 163 F.Supp.2d at 1380 (financial services firm estopped by unclean hands from enforcing restrictive covenant against former employee because it actively recruited brokers from competitors and encouraged them to retain copies of client records); *Salomon Smith Barney, Inc. v. Vockel*, 137 F.Supp.2d 599, 603–04 (E.D.Pa.2000) (same, but where the defendant financial analyst had previously been recruited by the complaining firm from a competitor and encouraged to bring former client account statements with him).

### III. Conclusion

WHEREFORE, Merrill Lynch's motion for a temporary restraining order and preliminary injunctive relief is **DENIED** (Doc. 4).